LEIGH M. CLARK, Retired Circuit Judge.
This is the second appeal in this case, it being the same case as that of White v. State, 448 So.2d 970 (Ala.Cr.App.1984), in which the judgment of conviction and sentence of assault in the second degree was reversed and the cause remanded for a new trial that resulted in another verdict of the jury finding defendant guilty of assault in the second degree and a judgment of the trial court sentencing defendant to imprisonment for twenty years, the same punishment that was imposed on the first trial.
The defendant pleaded not guilty and not guilty by reason of insanity in the case now under submission, as he had done on the previous trial of the case. The alleged victim was the wife of defendant at the time of the alleged crime and also at the time of the first trial, but at the time of the trial of the case now on appeal her name was Mary Holiday and by that name she testified as one of the witnesses for the State. We quote from the part of her testimony as to what occurred at the time of the alleged assault as follows:
“Q. Did you ever swing a lamp at Eugene that night?
“A. No, because I was too scared of him. I ain’t never swang at him.
“Q. Did you while running inside the house fall down on the concrete?
“A. I couldn’t have run inside the house, I just had started outside the door.
“Q. Did you fall down the concrete— “A. No.
“Q. —Outside of the house?
“A. When he knocked me down in the room.
“Q. What room was that?
“A. In the middle room.
[[Image here]]
“A. And I got in the bathroom, that’s when he started bumping my head up side the brick wall.
[[Image here]]
“A. Started in the front room, like I said, he choked me, it started in the front, when I went to the door and he walked up on the porch and he pulled me in the middle room is when he got his wrench.”
We now quote from some of the testimony of the defendant while being cross-examined by the attorney for the State:
“Q. Did you know what right is?
“A. Do I know what right is?
*397 “Q. Um-hum.
“A. Yes, I do.
“Q. Do you know what wrong is?
“A. Yes, I do.
“Q. Tell the jury what wrong is?
“A. Wrong is something when you do something wrong and right is when you do something earnest.
“Q. What happens to you if you do something wrong?
“A. Well, when you do something wrong bad things come to you.
“Q. All right. And if you took a pipe wrench and beat your wifé up with it, would that be wrong?
“A. Yes, that would be wrong, and plus that would be insanity.
“Q. It would be insanity?
“A. Yes.
“Q. Tell the jury how it would be insanity?
“A. Because any time a man hits a woman with a' wrench the size of my wife here and bottom of a commode top, he got to be insane.
“Q. All right, sir. Tell the jury, are you saying that you didn’t do it or are you telling them that you did it and you are insane?
“A. I’m saying that I ‘did not do it. I had problems but I don’t let my problems to cause me to do things, you know. Like if I was an alcoholic there, it don’t mean because I have the problems alcoholic that I have to drink alcoholic.
“Q. Mr. White, are you saying to this jury, then, that you didn’t do it but that if they believe that you did it then you were insane; is that what you are saying?
“A. I didn’t understand.
“Q. All right.
“A. Repeat that over.
“Q. Are you saying to the jury that you didn’t beat your wife?
“A. I did not beat my wife.
“Q. All right.
“A. With no wrench and commode top and bottom.
“Q. Did you beat her with anything?
“A. I hit her with my hand and she fell.
“Q. One time?
“A. I hit her with my hand one time there.
“Q. How do you account for the cuts on the left side of her face?
“A. Where the cuts come from, I don’t know where those cuts come from. All I know my cousin got a gun out there and I got in my car and left and I went up and got a hamburger and came back and saw the police.”
We quote also some of the additional testimony of the defendant on cross-examination by the attorney for the State:
“Q. Well, what did you think when you saw the police?
“A. Well, when I seen the police there I had my reason to keep on by, because I had been tried before. That’s why I kept on by. But at this particular time I kept on by there—
“Q. You didn’t want anything /to do with the police, is that what you are saying?
“A. No, well, I didn’t want anything to do with the police at that particular time. “Q. Did you think anything might be wrong with your wife?
“A. No, I did not think anything was wrong with my wife there, but I knew that she had called the police and I knowed about the system and that’s why I was scared because I had been tried before.
“Q. And you went to Detroit, Michigan, didn’t you?
“A. I went to Detroit, Michigan, fifteen days after I had called the hospital about seven times and seen how my wife was doing.
“Q. How was she doing? •
“A. Well at that particular time they wouldn’t give out any information. But they did tell me, I forget what number room she was in — no, she was in intensive care so I came up to the hospital there and sat in the waiting room there. But at that time there I seen Ms. Mitchell and her, I think it was her husband *398 and my cousin coming through there and I had the paper there and I put it in front of my face and I left out.
“Q. Do you have a very clear recollection of what happened that night? You clearly recall what happened that night, don’t you?
“A. To the best of my knowledge.
“Q. And on that night you knew that if you took this wrench and hit her that would be wrong; didn’t you know that? “A. Yes, I did know that would be wrong. That is if I had used the wrench on her.
“Q. And you knew that if you did that it would be a criminal act; didn’t you?
“A. Yes, I knew that.
“Q. Okay. And you were able to keep from hitting her if you wanted you; weren’t you?
“A. I didn’t understand' you.
“Q. I said you were able on that night to keep from hitting her if you had wanted to keep from hitting her; weren’t you?
“A. At this particular time when I told you I hit at her, that’s when she spitted in my face and I just went off.
“Q. You just went off?
“A. I just went off.
“Q. How did you go off?
“A. I hit her with the back of my hand.
“Q. You hit her with the back of your hand? How hard did you hit her with the back of your hand?
“A. I don’t know how hard I hit her with the back of my hand.
“Q. Well, show the jury how you swung that hand. Just pretend she is right there in front of you as she was that night and show them how you did it?
“A. I couldn’t say how I did it, but I know I hit her with the back of my hand.
“Q. Well, was it a light little slap, just like don’t do that any more, Mary; did you do that?
“A. No, it was not a light little slap.
“Q. You know you knocked her down, didn’t you?
“A. I probably did.
“Q. Probably knocked her down. Why haven’t you testified that you knocked her down before just then?
“A. I didn’t knock her down because I grabbed her and started shaking her. “Q. I see. You say you probably knocked her down but didn’t knock her down. Which was it?
“A. I did not knock her down when I hit her.
“Q. You hit her hard enough to knock her down but you caught her before she fell?
“A. No,‘ I’m not saying that.
“Q. What are you saying?
“A. I’m saying I hit her as hard as I — I hit her real hard. I hit her hard with my hand there.
“Q. Well, show the jury how hard you hit her?
“A. I hit her with the back of my hand, like this here (indicating).
“Q. You hit her harder than that though, didn’t you?
“A. Yeah, I hit her harder than that. “Q. Where did you hit her?
“A. I hit her, I think, across there (indicating).
“Q. Did you knock her teeth out?
“A. No, I didn’t knock her teeth out because the time her teeth was out there when she fell on the floor there when my cousin came in and she had fell on her mouth there.
“Q. You could see the teeth out on the floor? There were teeth on the floor; weren’t there?
“A. No, at this time there was no teeth on the floor.
“Q. So the teeth got on the floor after you left?
“A. I don’t know if the teeth got on the floor after I left there. I didn’t care to stay there after my cousin, me and him got into it. And I don’t know exactly what went on when I left there.
“Q. When you went to Detroit you were running from the law, weren’t you?
“A. Yes, I was.”
*399 The only witnesses, other than the defendant himself, who testified as witnesses for defendant were the defendant’s mother and brother, Ellie White and Ernest White, whose testimony almost exclusively pertained to defendant’s mental condition and was to the effect that it was below that.of people in general who possess normal mentality.
Some of the issues raised in brief of counsel for appellant pertain to the issue raised on the trial by the defendant’s plea of “not guilty by reason of insanity”; other issues pertain to the issue raised on the trial of defendant’s plea of not guilty. We think it appropriate for us to discuss first the issues raised in appellant’s brief that pertain to defendant’s defense of not guilty by reason of insanity.
The first Issue presented in brief of counsel for appellant is thus captioned in appellant’s brief:
“THE STATE CANNOT ASK A QUESTION THAT ASSUMES FACTS INTO EVIDENCE WHERE THOSE FACTS ARE NOT OTHERWISE SUPPORTED BY THE EVIDENCE.”
The issue is directed at what took place during the trial in the presence of the jury while defendant’s brother was on the witness stand as a witness for defendant and was being cross-examined by an attorney for the State. We quote therefrom as follows:
“Q. Now do you know when the first time he [defendant] went to Bryce Hospital was?
“A. No, I do not. But I know he was there because I received a letter from him, I was at Ft. McClennon [sic, but probably McClellan], if I can recall, it was either Ft. McClennon or either Ft. Carson. I received a letter from him and he was in a mental, what do you all [sic, but probably call] it, rehabilitation center, something of that sort.
“Q. I see. Do you know that one of times he was sent to the Department of Mental Health was for a mental evaluation to determine whether or not he was competent to stand- trial?
“A. No, I didn’t.
“MR. POOL [Defendant’s attorney]: Your Honor, we object to the prosecutor assuming a fact that’s not in evidence. “THE COURT: Overruled.
“Q. You didn’t know that?
“A. No, I did not.
“Q. Did you know he was also sent for determination of whether or not he was sane at the time he committed this crime?
“A. No, I did not know that.
“Q. I see. Did you know—
“MR. POOL: Your Honor, we have to object again because the question, Your Honor, with all due respect, is patently illegal. It’s a question that assumes a fact that’s not in evidence.
“MR. MADDOX [State’s attorney]: Judge, he has—
“THE COURT: Overruled. Go ahead. “MR. MADDOX: All right, sir. Then I will make a proffer of proof.
“Q. Did you know that the Department of Mental Health determined that he was competent to stand trial?
“MR. POOL: Object, Your Honor, same objection.
“THE COURT: Overruled.
“Q. Did you know that?
“MR. POOL: Your Honor, may we approach the Bench?
“(The following bench discussion took place out of the hearing of the jury as follows:)
“MR. POOL: Your Honor, this is the same point that the first trial was reversed on. I have the opinion, it’s one of the same points.
“THE COURT: I don’t know what the trial was reversed on. We are just trying this one.
“MR. POOL: But, Judge, it’s the same point.
“THE COURT: Overruled.
“(The following proceedings occurred in Open Court in the presence of the jury as follows:)
“THE COURT: Overruled. Go ahead.
*400 “MR. MADDOX: Your Honor, I have in my hand State’s Exhibit Number Nineteen which I have had marked for identification purpose which is the report of the Mental Health in regard to Mr. Eugene White and I offer it in evidence at this time.
“MR. POOL: Judge, this gentlemen is obviously—
“THE COURT: Do you all need to argue anything?
“MR. POOL: Well, my objection.
“THE COURT: If you object, just state your objections.
“MR. POOL: Of course, I object to any hearsay documents.
“THE COURT: I will reserve ruling on that.
“MR. POOL: We don’t object to the person who made the examination being present one bit.
“THE COURT: I will reserve ruling on it. Go ahead next question.”
We conclude from what we have quoted above from the court reporter’s transcript while defendant’s brother was being cross-examined by counsel for the State that the jury was informed by counsel for the State that it had been determined by the Department of Mental Health that defendant “was sane at the time he committed this crime” and that defendant “was competent to stand trial.” In our opinion, the rulings of the trial court that permitted the jury to receive such information constituted error prejudicial to defendant for the same reason set forth in the opinion of Judge Hubert Taylor on the appeal from the judgment of conviction and sentence on the previous trial of this case, in White v. State, supra, at 448 So.2d 9.72 as follows:
[[Image here]]
“The more correct statement of law is that, ‘the solicitor should not frame his questions so as to assume a fact not proven, but when the witness answers in such a way as to refute the assumption, it is error without injury.’ Vickers v. State, 18 Ala.App. 282, 91 So. 502 (1921). In the case sub judiee, the negative response did not refute the assumption; rather, it merely indicated that the witness had no knowledge of the fact that the D.A. was assuming.”
Other issues presented by appellant are worthy of serious consideration, but as they probably will not occur on a third trial of this case, we will not pass upon them at this time. The judgment of the trial court should be reversed and the cause remanded for another trial.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 828); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges concur.